# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
## No. 22-1264V

|  |  |
|---|---|
| DAVID M. CODUTO, | Chief Special Master Corcoran |
| Petitioner, | Filed: November 25, 2025 |
| v. |  |
| SECRETARY OF HEALTH AND HUMAN SERVICES, |  |
| Respondent. |  |

*Elizabeth Martin Muldowney, Sands Anderson PC, Richmond, VA, for Petitioner.*

*Naseem Kourosh, U.S. Department of Justice, Washington, DC, for Respondent.*

### RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES[1]

On September 9, 2022, David M. Coduto filed a Petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that he suffered a shoulder injury related to vaccine administration ("SIRVA") caused by an influenza ("flu") vaccine administered on January 8, 2021. Pet. at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

For the reasons described below I find that Petitioner is entitled to compensation, and I award **$110,000.00** for past pain and suffering, plus **$1,581.88** in past unreimbursable expenses, for a total award of **$111,581.88.**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

## I.    Relevant Procedural History

Following Respondent's medical review, the parties attempted to informally resolve this matter but were ultimately unsuccessful. ECF Nos. 38-41, 43-46. Respondent submitted his Rule 4(c) Report in the winter of 2024, arguing Petitioner could not establish that the onset of his injury occurred within 48 hours of the subject vaccination, or that he experienced limited range of motion ("ROM") as required for a Table SIRVA claim. *See generally* ECF No. 47.

Petitioner thereafter submitted additional medical records and supplemental declarations (authored by himself and his wife), followed by a motion for a ruling on the record regarding entitlement and damages on August 12, 2024. Petitioner's Motion ("Mot."), ECF No. 52; ECF Nos. 48-51. Respondent reacted to Petitioner's entitlement and damages contentions on October 9, 2024. Respondent's Response ("Opp."), ECF No. 53. Petitioner filed a reply thereafter, on November 19, 2024. Petitioner's Reply ("Reply"), ECF No. 55. This matter is now ripe for resolution.

## II.    Petitioner's Medical History

At age 33, Petitioner received the subject flu vaccine on January 8, 2021, in his right shoulder during a visit with his primary care physician ("PCP").[3] Ex. 7 at 2; Ex. 9 at 88.

One month post-vaccination, on February 8, 2021, Petitioner sent a message to his PCP, reporting that "[his] right arm, where [he] got [his] flu shot, is still really hurting and feeling stiff. It's been over a month[.]" Ex. 9 at 16. He wondered if this was normal. *Id.* In response to a nurse inquiry on February 9, 2021, Petitioner stated that his shoulder "constantly throbs" and the pain flares with movement. *Id.* at 17. When asked "how soon did this start after the flu shot[,]" Petitioner responded that he had a "bad case of the chills immediately thereafter (I think the night of)" and that "[t]he soreness never really went away. It just kinda morphed into what it is today." *Id.* at 19. Petitioner explained that he "kept expecting it to get better" and that the "outright pain when [he moves] feels newer. Last two weeks maybe[.]" *Id.* Petitioner received a referral to orthopedics. *Id.*

On February 11, 2021 – just over one month post vaccination – Petitioner sought care with an orthopedist. Ex. 9 at 91. Petitioner reported that his right shoulder "[s]ymptoms started roughly about a month ago after he got his flu shot." *Id.* Specifically, "[a]fter the flu shot his arm was sore but the soreness has continued and has not improved

---

[3] Petitioner received a Tdap vaccination in his left shoulder on the same date. Ex. 7 at 4-5. Petitioner does not allege a vaccine-related injury as a result of this vaccination. *See generally* Pet.

at this point" and "[o]ver the last 2-3 weeks he has felt that his shoulder has become more stiff[.]" *Id.* He stated that his pain interferes with his sleep, overhead movements, and behind the back activities, but that his pain does not limit his activities or work ability. *Id.* Petitioner had been taking Advil for the pain, which he rated at a 5-6/10 but an 8/10 with certain movements. *Id.*

Upon examination, Petitioner exhibited tenderness to palpation over the lateral aspect of the right shoulder, positive impingement signs, and slightly diminished external rotation (45 degrees on the left shoulder, compared to 40 degrees on the right). Ex. 9 at 92. The orthopedist assessed Petitioner with right shoulder impingement syndrome/bursitis. *Id.* Petitioner received a subacromial steroid injection in the right shoulder and was referred to physical therapy ("PT") "for shoulder [ROM] and rotator cuff strengthening exercises." *Id.*

In preparation for beginning PT, Petitioner filled out an intake form on March 1, 2021. Ex. 10 at 7. He wrote that his injury began after he "received a flu shot" and that his "[p]ain never went away & got worse with motion." *Id.* Petitioner rated his right shoulder pain prior to his receipt of his steroid injection at a "steady" 5-6/10 but an 8/10 with certain movements, and a 2-3 "with flares to 5-6" out of ten following the injection. *Id.*

Petitioner had his first PT session on March 9, 2021. Ex. 10 at 8. The date of injury onset was listed as "01/08/2021" and that he "had a flush [sic] in right arm. Right shoulder pain persisted." *Id.* Petitioner described his pain as "throbbing" and rated his pain at a 3/10 at best and an 8/10 at worst, with Advil "not really helping." *Id.* Upon examination, Petitioner exhibited reduced strength and ROM. *Id.* Specifically, his right shoulder flexion was measured at 140 degrees (compared to 145 on the left); abduction was measured at 160 degrees (compared to 170 on the left); extension was measured at 70 degrees (compared to 80 on the left); and his external rotation in a neutral position was measured higher on the right than left side (85 versus 80 degrees). *Id.* The physical therapist noted that Petitioner's Quick DASH score was a 22.73/100. *Id.* The treater also noted that Petitioner underwent therapeutic procedures to improve "ROM, strength, [and] endurance[,]" among other things. *Id.* at 9.

By Petitioner's eighth PT session on April 1, 2021, the treater rated Petitioner's Quick DASH score at a 29.55/100. Ex. 10 at 28. On examination, Petitioner continued to exhibit reduced ROM in the right shoulder. *Id.* For instance, Petitioner's extension of the right shoulder was measured at 60 degrees (compared to 80 degrees on the left); and his external rotation was measured at 66 degrees (compared to 80 degrees on the left). *Id.* Despite these findings, Petitioner demonstrated *greater* flexion and abduction in the right versus left shoulders. *Id.* The treater also noted "[p]ain at end of range of flexion and

external rotation" and "[p]ain with resisted external rotation." *Id.* Petitioner also showed reduced strength in the right shoulder, and he was "sensitive to deep palpation along posterior right rotator cuff tendons." *Id.* at 28-29.

On April 7, 2021, Petitioner returned to his orthopedist's office reporting that his steroid injection and PT had "helped in giving him better mobility and some motions are not as painful anymore[;]" however, he was "still having pain and in [sic] flexibility with other motions." Ex. 9 at 94. Petitioner reported he had been doing his home exercises from PT "at least 5-6 times per week" but was "still having pain and troubles with behind the back activities as well as holding his daughter," plus pain with sleeping that also limits his work activities. *Id.* He rated his pain at a 6-8/10. *Id.* An examination revealed tenderness to palpation of the right shoulder, positive impingement signs, plus symmetric ROM in the left and right shoulders (flexion and abduction measured at 180 degrees, external rotation measured at 45 degrees, and hand behind back to L5 vertebrae). *Id.* at 95. The treater's assessment was "right shoulder impingement syndrome, failing conservative treatment." *Id.*

Petitioner underwent an MRI of the right shoulder on April 12, 2021. Ex. 9 at 39. The impression was "moderate supraspinatus tendinosis. Bursal surface fraying distal supraspinatus tendon. Subacromial-subdeltoid bursitis. Biceps tenosynovitis. Moderate degenerative changes acromioclavicular joint." *Id.* During an April 14, 2021 follow-up visit, the orthopedist noted Petitioner was a candidate for surgical intervention; Petitioner elected to proceed with surgery. *Id.* at 47.

Less than four months post-vaccination, on April 30, 2021, Petitioner underwent a right shoulder arthroscopy, subacromial decompression, debridement of redundant labral tissues, and manipulation under anesthesia. Ex. 8 at 75. He was prescribed pain medications. *Id.* at 80. During a May 6, 2021 orthopedic follow-up visit, Petitioner reported he was doing well and his pain was "controlled" with over-the-counter ibuprofen. Ex. 9 at 100. The orthopedist told Petitioner to continue to work on his "[ROM] exercises and strengthening" with at-home exercises, and he referred Petitioner back to PT. *Id.*

Petitioner began a post-operative course of PT on May 14, 2021. Ex. 10 at 37. The current complaint was noted as "limited mobility, some pain with movement, especially elevation and [hand behind back]." *Id.* Petitioner rated his current pain at a 2/10, but a range of 1-4/10. *Id.* The physical therapist listed Petitioner's problems as "limited R shoulder ROM" and limited right shoulder strength. *Id.*

On June 10, 2021, Petitioner followed up with his orthopedist and reported he was "doing well" and "recovering very nicely" since surgery. Ex. 9 at 101. The orthopedist told

Petitioner to return on an as needed basis. *Id.* During a PT visit the same day, Petitioner reported he was "much better than before surgery" in that he had no trouble sleeping, dressing, or with hygiene but reaching behind his back still stressed his shoulder. Ex. 10 at 60. Petitioner noted he had not yet returned to athletic activities. *Id.*

Later that month, during Petitioner's June 29, 2021 PT visit, the treater noted that Petitioner had "progressed as expected." Ex. 10 at 76. The physical therapist wrote that Petitioner's strength was 4+/5 or better and his skill and coordination had not been fully restored. *Id.* More so, Petitioner's "[ROM] [was] below normal but functional" and the treater considered this short-term goal (of the right shoulder ROM being within normal limits) to be met. *Id.* The treater told Petitioner to continue his home exercise program ("HEP") and course of PT. *Id.*

Petitioner attended his 15th and final session of post-operative PT on August 13, 2021. Ex. 11 at 5. He complained of weakness and fatigue of the right shoulder, but the treater felt that the "feeling of fatigue and 'stiffness' . . . will take some more time to resolve." *Id.* The treater wrote that Petitioner was "[a]ble to resume full activity" and that Petitioner's short and long-term goals (primarily involving improvements in strength) were 75-85% met. *Id.* The plan was to continue with PT (with Petitioner's rehabilitation potential listed as "good") but Petitioner did not return to PT thereafter. *See id.*

Over one year later, on September 13, 2022, Petitioner went back to his PCP for an annual examination. Ex. 18 at 14. He reported "R shoulder pain" that he thought was "from picking up his toddler frequently[;]" he requested a PT referral. *Id.* The PCP's assessment included right shoulder pain that was thought to likely be a strain from picking up his child. *Id.* at 15. As requested, Petitioner was referred back to PT; he did not seek further treatment with PT at that time. *Id.*

Then, almost one year later, on August 9, 2023, Petitioner established care with a new PCP. Ex. 22 at 27. He reported his history of right shoulder pain and surgery (but without mentioning the subject vaccination) and requested "regular PT or education on continued maintenance[,]" as his right shoulder was not "feeling as stable." *Id.* The PCP noted that Petitioner exhibited decreased ROM on examination, and he referred Petitioner to PT. *Id.* at 29.

On September 20, 2023, Petitioner began another round of PT. Ex. 23 at 46. Petitioner described his injury course and noted his original injury in January 2021 from a flu injection. *Id.* at 47. He noted that his injury and ROM improved "to about 85%" and he now has "noticed increased pain and stiffness in rt [sic] shoulder for about a year." *Id.* He felt this aggravation "[m]ay have been aggravated by reaching back to [the] back seat

of car from drivers [sic] seat with a book." *Id.* Petitioner rated his pain at a 1-4/10 and that it was "worse with reaching behind, follow through with golf and carrying." *Id.* During his September 27th PT visit, Petitioner reported tightness and soreness in the right shoulder after kayaking. *Id.* at 34.

Petitioner ultimately underwent eight total PT sessions, with his last visit occurring on December 13, 2023. Ex. 24 at 3-24. During his last visit on December 13th, Petitioner reported he had returned to prior activities "without pain," he could reach overhead comfortably, and he rated his pain at a 0-1/10. *Id.* at 3. Petitioner was interested in doing yoga. *Id.* Petitioner's goals were considered met and he was told to continue his HEP "to maintain his full ROM and function[;]" he was discharged. *Id.* at 4. No additional medical records have been filed.

### III.    Declaration Evidence

In his original declaration (drafted in July 2022), Petitioner attests that both of his arms were tender after receiving the subject flu (and non-subject Tdap) vaccinations on January 8, 2021. Ex. 1 at 1. He states that "[o]ver the next few days, [his] left arm recovered" but his right arm was "still tender and sore." *Id.* His right arm pain and discomfort "continued to escalate and within approximately one week, [his] right arm was throbbing." *Id.* Petitioner assumed this was normal and that it would "eventually resolve." *Id.* Instead of improving, however, the pain intensified (especially with movement and touch) and felt "stiff." *Id.* When his pain did not resolve, he reached out to his PCP in February 2021. *Id.*

In his supplemental declaration (authored in August 2024), Petitioner describes in more detail his limitations with playing with his young daughter as a result of his vaccine-related injury. Ex. 26 at 1. For instance, "to accommodate the soreness and tightness" in his right shoulder, he modified his play by trying to favor his left arm for things like picking her up, carrying her up the stairs, or pushing her on the swings. *Id.* He also attests that he could no longer regularly do "horsey rides" because reaching behind his back or putting the full weight on his right shoulder was difficult. *Id.* at 1-2. Additionally, Petitioner notes he lost time playing golf with his father and can no longer play "prolonged fetch" with his dog – things he did not expect to deal with in his 30s. *Id.* at 2. He states that "his arm just isn't as good as it once was[,]" and he needs to stretch his shoulder each day. *Id.* at 2-3.

Petitioner's wife also authored a declaration on his behalf, authored in July 2022. She states that Petitioner "had some discomfort on both arms" on the day he received the subject flu vaccination. Ex. 2 at 1. She endorses Petitioner's contention that the pain in his left arm resolved, while his right shoulder pain only intensified in severity. *Id.* She

recalls an instance "[a]bout a week" post vaccination when Petitioner told her "his right arm still hurt[;]" she brushed it off, but Petitioner's complaints persisted "for weeks." *Id.* Petitioner's wife adds that Petitioner's pain was interfering with his ability to hold and care for their newborn. *Id.* She notes Petitioner's limitations with mobility. *Id.* at 2.

In her supplemental declaration (drafted in August 2024), Petitioner's wife mentions Petitioner's ongoing difficulties picking up and holding their daughter for long periods of time. Ex. 27 at 1. As a result, he would try to favor his non-dominant left arm, which would tire easily. *Id.* She also notes his difficulties reaching behind his back, including to give their daughter something in the car. *Id.* Petitioner's wife continues to notice Petitioner icing his shoulder, stretching, using a massage gun, and taking Advil for the pain. *Id.* at 1-2. Petitioner's wife worries about his shoulder in caring for their newborn son, including with things such as lifting the car seat out of the car. *Id.* at 2. No other declaration evidence has been submitted.

## IV.    Fact Findings and Ruling on Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[4] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

Section 11(c)(1) also contains requirements concerning the type of vaccination received and where it was administered, the duration or significance of the injury, and the lack of any other award or settlement. *See* Section 11(c)(1)(A), (B), (D), and (E). With regard to duration, a petitioner must establish that he suffered the residual effects or complications of such illness, disability, injury, or condition for more than six months after the administration of the vaccine. Section 11(c)(1)(D).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48

---

[4] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury. *See* § 11(c)(1)(A)(B)(D)(E).

hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

> (ii) Pain occurs within the specified time frame;

> (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

> (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence demonstrates that Petitioner has satisfied the QAI requirements for a Table SIRVA.

### 1. Petitioner Has No Prior Right Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Respondent has not contested that Petitioner meets this criterion, and there is nothing in the filed evidence to suggest otherwise.

### 2. Onset of Petitioner's Injury Occurred within 48 Hours of his Vaccination

The aforementioned medical records, coupled with Petitioner's declarations, establish that Petitioner consistently reported to treaters onset close-in-time to vaccination, that he sought treatment within roughly one month of his January 8, 2021 vaccination, and that he indeed was experiencing symptoms in the relevant timeframe.

Respondent argues Petitioner cannot establish onset because he did not report shoulder issues until one month following his vaccination. Rule 4(c) Report at 7. More so, although he has stated that he experienced "immediate" chills "the night of" his vaccination, he "reported his shoulder pain only in vague terms, describing soreness that morphed into pain approximately two to three weeks after vaccination." Opp. at 8 (citing Ex. 9 at 16-19, 91; Ex. 10 at 8).

These onset objections are ultimately unpersuasive, however, when considered against the totality of the evidence. First, the records show that Petitioner reported shoulder pain and sought treatment in a relatively timely manner (i.e., exactly one month after vaccination). It is common for SIRVA petitioners to delay seeking treatment, thinking the injury will resolve on its own, since patients are often told by medical providers at the time of vaccination to expect some soreness and pain for a period of time after. Here, however, the delay was not appreciably long – and close enough to the vaccination event to have some credibility as well as proof of onset.

Second, Petitioner affirmatively and repeatedly linked his right shoulder pain to the subject flu vaccine – beginning with the February 8th message to his PCP's office, at which time he noted that "[his] right arm, where [he] got [his] flu shot, is still really hurting and feeling stiff. It's been over a month[.]" Ex. 9 at 16. Other subsequent medical records also corroborate the contention made in Petitioner's and his wife's declarations that Petitioner's pain began within 48 hours of vaccination. *See,* e.g., *id.* at 91 (a February 11, 2021 orthopedic record that his symptoms "started roughly about a month after he got his flu shot," specifically, "[a]fter the flu shot his arm was sore but the soreness has continued and has not improved at this point"); Ex. 10 at 7 (a March 1, 2021 PT intake form noting he "received a flu shot" and that his "[p]ain never went away & got worse with motion."); *id.* at 8 (a March 9, 2021 initial PT report listing the onset date as "01/08/2021" and that he "had a flush [sic] in right arm. Right shoulder pain persisted."). Some of these medical entries do not contain a precise date of onset, instead including only a general temporal relationship between onset of his injury and his subject flu vaccination. Yet, Petitioner consistently linked the two events.

More so, although Respondent is correct that one of Petitioner's reports identifies the onset of *"chills"* immediately beginning the night of vaccination – rather than *right shoulder* pain that began specifically in this timeframe - this reporting does not fully detract from Petitioner's onset contentions. In fact, the second half of Petitioner's report from February 9th reflects that the soreness in his right shoulder "never really went away" and instead "morphed into what it is today." Ex. 9 at 17, 19. This entry thus does not outweigh the entries favorable to Petitioner on the issue of onset.

Accordingly, and based upon the above, I find there is preponderant evidence that establishes the onset of Petitioner's right shoulder pain more likely than not occurred within 48 hours of vaccination, and thus within the Table timeframe.

### 3. Petitioner's Pain was Limited to his Right Shoulder and he Experienced Limited ROM

The third requirement for a Table SIRVA is that the pain and limited ROM are limited to the shoulder in which the subject vaccination was administered. 42 C.F.R. § 100.3(c)(10)(iii). A Table SIRVA claim *does* require that a petitioner establish limited or reduced ROM. *Bolick v. Sec'y of Health & Hum. Servs.*, No. 20-893V, 2023 WL 8187307, at *6 (Fed. Cl. Oct. 19, 2023). While Respondent *does not* contest that Petitioner's pain was limited to the vaccinated shoulder, he argues that Petitioner did not exhibit reduced ROM and thus cannot meet this requirement. Opp. at 8-9. Respondent cites to records showing only a minimally reduced ROM on examination, including at Petitioner's first post-vaccination visit on February 11, 2021, and records showing equal or greater ROM on the right compared to left side throughout his treatment course. *Id.* at 9 (citing Ex. 9 at 47, 92, 95; Ex. 10 at 8, 28).

Here, although Petitioner did not exhibit *significantly* reduced ROM, he exhibited diminished ROM on examination on several occasions. *See,* e.g., Ex. 9 at 92 (an examination on February 11, 2021, showing slightly diminished external rotation (45 degrees on the left shoulder, compared to 40 degrees on the right)); Ex. 10 at 8-9 (a March 9, 2021 PT examination measuring right shoulder flexion at 140 degrees (compared to 145 on the left); abduction at 160 degrees (compared to 170 on the left); extension at 70 degrees (compared to 80 on the left), with the treater performing procedures to improve ROM). More so, Petitioner's treaters noted his ROM limitations. *See,* e.g., Ex. 9 at 100 (a May 6, 2021 orthopedic instruction to work on his "[ROM] exercises and strengthening" with at-home exercises); Ex. 10 at 37 (a May 14, 2021 PT active problem list including "limited R shoulder ROM"); Ex. 10 at 76 (a June 29, 2021 PT visit noting Petitioner's "[ROM] [was] below normal but functional").

There is no requirement regarding the degree to which a petitioner must suffer from restricted ROM - only that he did so at some point post-vaccination. While Respondent is correct that Petitioner (at times later in his treatment) exhibited symmetric or greater ROM in the right shoulder compared to the left (e.g., Ex. 9 at 94), this does not negate Petitioner's earlier showings of reduced ROM in the right shoulder. Thus, when the record is viewed in its entirety, there is preponderant evidence that establishes Petitioner experienced reduced ROM in his right shoulder and he can accordingly satisfy this Table criterion.

### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain a petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Respondent does not contend that Petitioner fails to meet this criterion, and there is not preponderant evidence in the filed record to suggest otherwise.

### B. Other Requirements for Entitlement

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). Respondent does not dispute that Petitioner has satisfied these requirements in this case, and the overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Petitioner received a flu vaccine intramuscularly in his right shoulder on January 8, 2021, in California. Ex. 7; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for his injury. Pet. ¶ 11; Section 11(c)(1)(E) (lack of prior civil award). As stated above, I have found that the onset of Petitioner's right shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). Therefore, Petitioner has satisfied all requirements for a Table SIRVA. Additionally, it is not disputed that Petitioner has established the six-month severity requirement. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement).

Based upon all of the above, Petitioner has established that he suffered a Table SIRVA. Additionally, he has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## V.    Damages

The parties have also briefed damages in this case, which are limited to a request for an award of past pain and suffering and unreimbursed expenses. Petitioner requests $140,000.00 for actual pain and suffering and $5,298.20 in unreimbursed expenses (comprised of $5,029.13 in out-of-pocket medical expenses and $269.07 in mileage reimbursement). Mot. at 16; Reply at 5.

Respondent proposes an award of less than $95,000.00 for past pain and suffering and disputes the full amount of Petitioner's request for unreimbursed expenses, in that Petitioner has not corroborated he paid certain amounts, the amounts Petitioner claims for 2023 were unrelated to his alleged vaccine injury, and his claim for mileage reimbursement is based on the IRS business rate, rather than the appropriate medical rate. Opp. at 18, n.5.

### A.  Legal Standards for Damages Awards

In several recent decisions, I have discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within the SPU. I fully adopt and hereby incorporate my prior discussion in Sections I and II of *Timberlake v. Sec'y of Health & Hum. Servs.*, No. 20-1905V, 2025 WL 721730 at *1 – 3 (Fed. Cl. Spec. Mstr. Feb. 19, 2025) to the instant ruling and decision.

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." Section 15(a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[5]

### B.  Appropriate Compensation for Pain and Suffering

In this case, awareness of the injury is not disputed, leaving only the severity and duration of the injury to be considered. In determining appropriate compensation for pain and suffering, I have carefully reviewed and taken into account the complete record in

---

[5] *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Hum. Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

this case, including all medical records, affidavits, plus all filings submitted by both Petitioner and Respondent. I have also considered prior awards for pain and suffering in both SPU and non-SPU SIRVA cases and relied upon my experience adjudicating these cases. However, my determination is ultimately based upon the specific circumstances of this case.

Citing five prior damages determinations (*Dobbins, Reynolds, Rafferty, Brantley-Karasinkski,* and *Blanco*),[6] Petitioner requests an award of $140,000.00 for actual pain and suffering. Mot. at 25-28. He asserts that the severity of his injury is comparable to the awards from the aforementioned SIRVA cases. In particular, Petitioner emphasizes that the duration of his injury was "approximately 3 years[,]" during which he experienced immediate post-vaccination pain, prompting him to seek medical care within one month of vaccination. *Id.* at 21. He thereafter rated his pain at a 1-8/10 throughout his three-year treatment course, underwent diagnostic procedures including an MRI, received one steroid injection, participated in 32 sessions of PT (including both pre- and post-operative rounds), and underwent one surgery for his right shoulder impingement syndrome and bursitis. *Id.* at 21-22 (internal citations omitted).

Petitioner also emphasizes the impact his injury had on his quality of life, in that the pain interfered with his sleep, work ability, reaching behind his back or overhead, and ability to care for and hold his young daughter. Mot. at 21-24. He argues that his injury still requires "daily exercise to control his pain as well as maintain his full [ROM] and function." *See id.* at 23-24; *see also generally* Reply.

Respondent, by contrast, maintains that an award of no more than $95,000.00 is appropriate. Opp. at 18. Although Petitioner underwent arthroscopic surgery, Respondent contends that Petitioner's injury was "mild to moderate," with "an exceptionally short duration and an excellent outcome." *Id.* at 14. Specifically, Petitioner's course was "limited" in that he delayed seeking treatment for one month post vaccination, he received one steroid injection, attended 23 sessions of PT (eight sessions pre-surgery and 15 sessions post-surgery), and he did not seek treatment after "about seven months post vaccination." *Id.* Respondent asserts that Petitioner's reports of right shoulder pain in September 2022 and August 2023 were unrelated to his alleged vaccine-related injury in

---

[6] *Dobbins v. Sec'y of Health & Hum. Servs.*, No. 16-0854V, 2018 WL 4611267 (Fed. Cl. Spec. Mstr. Aug. 15, 2018) (awarding $125,000.00 for actual pain and suffering); *Reynolds v. Sec'y of Health & Hum. Servs.*, No. 19-1108V, 2021 WL 3913938 (Fed. Cl. Spec. Mstr. July 29, 2021) (awarding $125,000.00 for actual pain and suffering); *Rafferty v. Sec'y of Health & Hum. Servs.,* No. 17-1906V, 2020 WL 3495956 (Fed. Cl. Spec. Mstr. May 21, 2020) (awarding $127,500.00 for actual pain and suffering); *Brantley-Karasinkski v. Sec'y of Health & Hum. Servs.,* No. 20-1058V, 2023 WL 7160919 (Fed. Cl. Spec. Mstr. Sept. 28, 2023) (awarding $125,000.00 for actual pain and suffering); and *Blanco v. Sec'y of Health & Hum. Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020) (awarding $135,000.00 for actual pain and suffering).

2021.[7] *Id.* at 15. He thus compares the facts of Petitioner's case to the petitioners in *Langdon, Hunt,* and *Clendaniel.*[8] *See id.* at 17-18.

The filed record in this case establishes that Petitioner suffered a moderate SIRVA overall, significant enough to require surgery but mild in terms of other treatment received and the duration of his injury. Particularly relevant to my decision is the evidence demonstrating Petitioner's complaint of vaccine-related pain to his PCP within one month of his vaccination, subsequent treatment with over-the-counter medications, an MRI (showing moderate supraspinatus tendinosis, bursal surface fraying of the distal supraspinatus tendon, subacromial-subdeltoid bursitis, biceps tenosynovitis, and moderate degenerative changes), one corticosteroid injection, one surgery (which Petitioner underwent less than four months post onset), and participation in 23 sessions of PT (including pre- and post-surgical rounds), plus at-home PT exercises – resulting in some residual effects.

Additionally, Petitioner's medical records contain descriptions of his pain on a ten-point scale – beginning at his first post-vaccination visit and thereafter. *See,* e.g., Ex. 9 at 91 (a February 11, 2021 report of pain rated at a 5-6/10 but an 8/10 with certain movements); Ex. 10 at 7 (a March 1, 2021 report of pain that started at a 5-6/10 and 8/10 with movements, but following the steroid injection a 2-3/10 with flares to 5-6/10); Ex. 10 at 8 (a March 9, 2021 report of pain ranging from a 3-8/10); Ex. 9 at 94 (an April 7, 2021 report of pain ranging from a 6-8/10); Ex. 10 at 37 (a May 14, 2021 post-operative report of current pain at a 2/10 but a range of 1-4/10 at best and worst). Such notations support a moderately severe SIRVA upon onset (especially with movement), with temporary improvement following his receipt of a steroid injection in February 2021, and fairly significant improvement towards the conclusion of his treatment, and within one month of his April 30, 2021 surgery.

More so, the record shows that Petitioner experienced reduced ROM to some degree throughout his treatment course. These ROM restrictions (and associated pain) impacted his ability to sleep, reach overhead, behind his back, and with holding his young daughter. *See,* e.g., Ex. 9 at 91-92, 94. And, as discussed in detail above, his reduced

---

[7] Specifically, Respondent argues that these complaints "occurred one and two years, respectively, after he last reported or sought treatment for right shoulder pain (in August 2021)," and also after he commenced the instant litigation (in September 2022). Opp. at 15. More so, when Petitioner returned to care, Petitioner himself reported this pain "as new, apparently transient, and stemming from activities that he had recently undertaken." *Id.*

[8] *Langdon v. Sec'y of Health & Hum. Servs.,* No. 20-1311V, 2023 WL 3411103 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (awarding $99,000.00 in past pain and suffering); *Hunt v. Sec'y of Health & Hum. Servs.,* No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) (awarding $95,000.00 in past pain and suffering); and *Clendaniel v. Sec'y of Health & Hum. Servs.,* No. 20-213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr. Aug. 18, 2021) (awarding $60,000.00 in past pain and suffering).

ROM – though not significant – was documented on examination at Petitioner's first post-vaccination visit and through roughly April 2021 (at least). *See,* e.g., *id.* at 92 (an external rotation measure of 45 degrees on the left shoulder, compared to 40 degrees on the right); Ex. 10 at 8 (a March 9, 2021 PT evaluation documenting reduced flexion, abduction, extension of the right shoulder – but greater external rotation on the right than left side); Ex. 10 at 28 (an April 1, 2021 PT examination showing limited right shoulder extension and external rotation – but greater flexion and abduction in the right versus left sides); Ex. 9 at 94 (an April 7, 2021 examination finding symmetric ROM in the left and right shoulders).

Despite symmetric (or better) findings on examination by April 2021, Petitioner's treaters continued to note ongoing ROM limitations for several months thereafter. *See,* e.g., Ex. 9 at 100 (a May 6, 2021 instruction to work on "[ROM] exercises" with at-home exercises); Ex. 10 at 37 (a May 14, 2021 "active problem" list including "limited R shoulder ROM"); Ex. 10 at 76 (a June 29, 2021 note showing "[ROM] [was] below normal but functional"). The medical records thus show that Petitioner's limitations in ROM continued *to an extent.* While said records do not fully support Petitioner's assertion made in his August 2024 declaration that his ROM has not fully recovered by that time (in that he cannot reach behind his back without needing to stretch his shoulder afterwards – Ex. 26), there is evidence (albeit slight) that his limitations in ROM continued through *at least* summer 2021.

The record also preponderantly establishes that Petitioner's treatment course and ongoing symptoms continued for approximately seven months – with lingering effects, not all of which are likely attributable to the SIRVA. Although Petitioner alleges a three-year course, there is insufficient evidence in the contemporaneous medical records to show that his later complaints (including one visit on September 13, 2022, and then another course of treatment beginning almost a year later, on August 9, 2023, including another round of PT), are related to his original vaccine-related treatment which occurred predominantly during 2021. Indeed, during Petitioner's last PT visit on August 13, 2021, while Petitioner complained of ongoing weakness and fatigue, the treater felt that this was expected to take time to resolve and, in the meantime, Petitioner was permitted to "resume full activity" as his goals were 75-85% met and his prognosis was "good." Ex. 11 at 5. With that, Petitioner did not return for treatment thereafter (with PT or otherwise).

Instead, it was not until September 13, 2022, *after the filing of the instant claim and thus after the retention of counsel,* when Petitioner decided to return to care. At that time, rather than link his pain to the subject vaccination or his prior injury, he thought "it[ wa]s from picking up his toddler frequently." Ex. 18 at 14. This entry therefore does not provide support to link this later treatment to his original injury course. More so, it is unhelpful to

Petitioner that: 1) he did not return to treatment for his right shoulder following this visit, 2) he did not do so until approximately *eleven months* later, in August 2023, and 3) he did not link his right shoulder pain to the original injury until a month later, on September 20, 2023 *(while the parties were engaged in settlement discussions) – thus creating reasons to doubt Petitioner's assertions*.[9] Ex. 22 at 27; Ex. 23 at 46-47. And, by this September 20th visit and thereafter, Petitioner likewise posited other reasons for the exacerbation of his pain, including reaching behind to give his daughter something in the car; he also noted participation in golfing and kayaking by that time. Ex. 23 at 34, 47.

While I credit Petitioner's and his wife's assertions in their declarations that Petitioner has continued to experience some residual symptoms of his SIRVA, including pain and limited ROM (or ROM with pain), especially with activities involving his young children, his overall recovery has been fairly good – facts supported by his taper in treatment and his noted return to physical activities involving the right shoulder (i.e., golf, kayaking). *See* Exs. 26-27; *see also* Ex. 23 at 34, 47. Indeed, Petitioner's and his wife's assertions underscore that his lingering symptoms, although present, were manageable with conservative treatment (i.e., ice, stretching, massage gun, Advil) without requiring his return to further formal treatment. Still, to the extent that Petitioner's rehabilitative goals were only noted to be 75-85% met as of August 2021, I thus find that Petitioner's injury was ongoing through August 2021 (with some lingering sequelae thereafter).

The severity and duration of the injury at issue herein is ultimately distinguishable from Respondent's cited cases. In *Clendaniel,* for example, a petitioner did not undergo surgery or any treatment with PT. No. 20-213V, 2021 WL 4258775 (Fed. Cl. Spec. Mstr.

---

[9] Judicial officers have long recognized that participation in litigation may impair the accuracy of a person's memory. *See Reusser v. Sec'y of Health & Hum. Servs.,* 28 Fed. Cl. 516, 523 (1993) ("written documentation recorded by a disinterested person at or soon after the event at issue is generally more reliable than the recollection of a party to a lawsuit many years later"); *Mueller v. Sec'y of Health & Hum. Servs.,* No. 06-775V, 2011 WL 1467938, at *9 (Fed. Cl. Spec. Mstr. Mar. 16, 2011) ("Memories are generally better the closer in time to the occurrence reported and when the motivation for accurate explication of symptoms is more immediate."); *Thelen v. Sec'y of Health and Hum. Servs.,* No. 90-22V, 1991 WL 38084, at *11 (Fed. Cl. Spec. Mstr. Mar. 6, 1991) (stating that the pressures of litigation may affect memory); *see also Rastetter v. Sec'y of Health & Hum. Servs.,* No. 19-1840V, 2023 WL 5552317, at *10 (Fed. Cl. Spec. Mstr. Aug. 3, 2023) (affording little weight to a statement made after a 17-month gap in treatment, where the petitioner told the treater the return to care was at the direction of the lawyer); *Duda v. Sec'y of Health & Hum. Servs.,* No. 19-31V, 2021 WL 4735857, at *8 (Fed. Cl. Spec. Mstr. Aug. 10, 2021) (affording less weight to later statements made for the purposes of litigation that directly conflicted with earlier reports to treaters). While this does not mean *every* petitioner who knows of the Program's existence or has a potential vaccine claim is inherently not credible, the specific factual circumstances must be considered, and they are *not* favorable to Petitioner here. *See Buck v. Sec'y of Health & Hum. Servs.,* No. 19-1301V, 2023 WL 6213423, at *8 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (failing to "dismiss the possibility that a petitioner *could* be incentivized to exaggerate their injuries by the prospect of monetary gain, [but noting] that does not mean that every petitioner who knows the Program exists is not credible").

Aug. 18, 2021). Respondent's reliance on this case is therefore wholly misplaced based on these factors alone and a further discussion is thus not warranted.

Additionally, and as I have often stated, *Hunt*, No. 19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr. June 16, 2022) is in the line of cases serving as "outlier determinations, and rare instances of deviating from the above $100,000.00 'norm' for SIRVA cases involving surgery." *Laurette v. Sec'y of Health & Hum. Servs.*, No. 19-1047V, 2024 WL 1741611, at *5 (Fed. Cl. Spec. Mstr. Mar. 25, 2024); *see also, e.g.*, *Olson v. Sec'y of Health & Hum. Servs.*, No. 21-0408V, 2024 WL 1521634, at *4 (Fed. Cl. Spec. Mstr. Mar. 4, 2024) (characterizing the cases as "outliers in the context of SIRVA damages"); *Gao v. Sec'y of Health & Hum. Servs.*, No. 21-1884V, 2023 WL 6182455, at *3 (Fed. Cl. Spec. Mstr. Aug. 18, 2023) (emphasizing that *Hunt* and *Shelton* were "*sui generis* instances of a sub-six figure award in SIRVA cases featuring surgery").

"In short, the policy goals of the Vaccine Program are best served if outcomes in common cases (like SIRVA vaccine injury claims) are predictable and/or subject to some uniformity – and it has been my determination that surgery cases reasonably present a degree of suffering justifying a six-figure award. (Otherwise, adjustments are always considered and made to account for the facts of each case, and in some instances even SIRVA surgery cases result in lower pain and suffering awards)." *Richardson v. Sec'y of Health & Hum. Servs.*, No. 20-0674V, 2023 WL 6180813, at *8 (Fed. Cl. Spec. Mstr. Aug. 16, 2023). Here, Petitioner's SIRVA appears to be somewhat on the mild end of comparable cases requiring surgery – but not so exceptional to warrant a departure below the six-figure norm (and certainly not even lower such that it might fit Respondent's proposal of $95,000.00).

On the other hand, *Langdon* was one instance out of Respondent's cited comparables wherein an award below $100,000.00 was appropriate in a surgical SIRVA case. No. 20-1311V, 2023 WL 3411103 (Fed. Cl. Spec. Mstr. Apr. 7, 2023) (awarding $99,000.00 in pain and suffering). Indeed, although the *Langdon* petitioner received some additional treatment compared to Petitioner here (i.e., two steroid injections versus Petitioner's one, and 31 PT sessions, versus Petitioner's 23), *Langdon's* three-and-a-half-year course included a two-year gap during which he did not mention ongoing shoulder issues despite receiving orthopedic care, followed by a surgery at that point – thus underscoring the mildness of his injury. *See id.* Petitioner here underwent a surgery within four months of vaccination and had continuous treatment. More so, the *Langdon* petitioner had a deformity evident on MRI that may have accounted for his ongoing symptoms rather than his SIRVA – likewise entitling him to a lesser award. Such similar facts are not present in Petitioner's case, and I therefore do not find it appropriate to dip below a six-figure award here.

The cases relied upon by Petitioner are more instructive in that each petitioner underwent comparable treatment with surgery. But the severity of Petitioner's injury does not quite warrant the $140,000.00 sum requested by Petitioner (or even the lowest amount of $125,000.00 awarded in his cited cases).[10] For instance, of Petitioner's cited cases, the *Blanco* petitioner received an award of $135,000.00, thus closest to the sum Petitioner requested. No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020). However, Petitioner's case is entirely distinguishable from the petitioner in *Blanco*. Indeed, the *Blanco* petitioner's treatment course included four steroid injections, 43 PT sessions, three MRIs, and massage and acupuncture therapies over a two-and-a-half-year course (with a lengthy gap). *See id.* The *Blanco* petitioner's treatment course was thus entirely more aggressive than Petitioner's in this case, and he is appropriately deserving of a much lesser award.

Thus, turning to Petitioner's cited cases with lower awards, the *Reynolds* petitioner presented within two weeks of the subject vaccination, was treated with prescription oral steroids, two cortisone injections, two rounds of PT (totaling 12 sessions), underwent a surgery, and treated for a duration of 24 months. No. 19-1108V, 2021 WL 3913938 (Fed. Cl. Spec. Mstr. July 29, 2021). Here, while Petitioner treated with more PT sessions (23 versus 12), his treatment course was milder overall than the *Reynolds* petitioner in all other respects, including a significantly shorter duration (seven months versus 24 months), less steroid injections, and no prescription medications. *See id.* Petitioner in this case is therefore deserving of a lower sum than the *Reynolds* (and similarly situated) petitioners.

Likewise, in Petitioner's other cited case in which the lowest amount of $125,000.00 was awarded, *Brantley-Karasinkski,* the petitioner experienced a more severe injury and treatment course overall, consisting of seeking care within two days of vaccination, 21 PT sessions, four steroid injections, chiropractic care, and surgery – over a 16-month period. No. 20-1058V, 2023 WL 7160919 (Fed. Cl. Spec. Mstr. Sept. 28, 2023). Petitioner in this case received three less steroid injections, did not undergo *any* chiropractic care, and treated for less than half the time of the *Brantley-Karasinkski* petitioner. A lesser sum is thus properly awarded to Petitioner here.

---

[10] Petitioner discusses the case of *Dobbins* in the most detail. Mot. at 25-27 (citing No. 16-0854V, 2018 WL 4611267, at *2 (Fed. Cl. Spec. Mstr. Aug. 15, 2018)). However, *Dobbins* was decided in 2018 by another special master and thus is not as persuasive as the other cases on which he relies. *See,* e.g., *Piccolotti v. Sec'y of Health & Hum. Servs.*, No. 20-0135V, 2023 WL 3165383, at *5 (Fed. Cl. Spec. Mstr. May 1, 2023) ("While I certainly consider cases decided by other special masters for guidance, cases where I have already ruled in similar circumstances are particularly helpful, since it has been my goal in SPU (and in promulgating "Motions Day" as well) to fashion consistent results that might guide the parties in future damages disputes.").

As noted above, I have concluded that Petitioner suffered a moderately severe injury, which required surgery but was otherwise treated with limited and conservative treatment within seven months of vaccination, resulting in lingering symptoms. Based on a review of the case evidence and in my experience, I find that **$110,000.00** is an appropriate award for Petitioner's actual pain and suffering.

### C. Appropriate Compensation for Past Unreimbursed Expenses

#### i. Out-of-Pocket Expenses

Petitioner requests $5,029.13 in out-of-pocket medical expenses incurred in 2021 and 2023. Mot. at 18; Mot. Ex. 1 (Damages Chart); Reply at 7. In a single footnote, Respondent acknowledges that Petitioner's documentation shows he paid $1,100.00 for PT sessions in 2021. Opp. at 18, n.5 (citing Ex. 17 at 1-2). However, Respondent disputes another $288.00 amount for PT sessions in 2021, as the documentation shows Petitioner owed this amount, not that it was paid. *Id.* (citing Ex. 11 at 12). Similarly, Respondent contends that Petitioner did not pay $3,439.92 for medical visits in 2021, only that he owed that amount, "as the only payments made on this bill were made by insurance companies." *Id.* (citing Ex. 20 at 1). Finally, Respondent asserts that Petitioner's claimed amount for 2023 ($201.21) should not be compensated, as this treatment was unrelated to Petitioner's alleged vaccine-injury. *Id.*

Respondent's arguments against Petitioner's out-of-pocket expenses paid have *some* merit. First, as I have already determined that Petitioner's treatment in 2022 and thereafter should not be compensated as part of his vaccine-related injury, I will follow Respondent's suggestion here and *not* award Petitioner his requested amount for expenses incurred in 2023 ($201.21).

Second, Respondent's contentions regarding the amount paid for Petitioner's visits in 2021 ($3,439.92) (designated as "PAMF" in Mot. Ex. 1) are likewise persuasive. As Respondent correctly points out, the documentation for Petitioner's alleged payments for these visits reflects the "payer" as Petitioner's insurance companies, along with the amounts paid and affiliated dates. Ex. 20 at 1. While the itemization contains a column referring to "patient a[mount]" (i.e., the amount owed by Petitioner), it appears that the amount listed as Petitioner's (the patient's) responsibility was the difference between the total billed amount and what the insurance company paid. But there is insufficient evidence in the filed record to show Petitioner actually paid the difference, or when, as the status reads "billed." *See id.* An excerpt of the itemization appears below for reference:

| DOS | CPT | DX1 | DX2 | DX3 | BILLED AMT | PATIENT AMT | STATUS | PAID AMT | PAYER | 2ND PAID | 2ND PAYER | PAID DATE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2/11/2021 | 93244 | M75.41 | | | $571.00 | $50.00 | BILLED | $521.00 | UNITED HEALTHCARE | | | 2/24/2021 |

*See id.* Petitioner will not be awarded the $3,439.92 in expenses requested for these visits in 2021.

On the other hand, however, Respondent's dispute concerning the $288.00 amount allegedly paid for PT in 2021 is not supported by the record. Rather, Petitioner's documentation shows the $288.00 amount was identified as being the "patient[s]" (Petitioner's) responsibility after insurance, with an outstanding balance of "$0.00." Ex. 11 at 12. Thus, contrary to the evidence above, Petitioner's documentation for this bill shows that he paid this amount, and he is therefore entitled to reimbursement of this $288.00 claimed expense. **I thus award Petitioner $1,388.00 in total out-of-pocket expenses.**

### ii. Mileage

Applying the IRS business rate,[11] Petitioner requests $269.07 in medical mileage. Mot. at 19; Reply at 7, 11-13. Alternatively, Respondent contends that the IRS medical mileage rate[12] ought to apply, as "these trips were plainly undertaken for medical, rather than business, purposes." Opp. at 18, n.5. Respondent does not otherwise offer a total sum to be awarded in medical mileage or address this issue in further detail. *See id.*

In support of his position, Petitioner cites my recent decisions in *Kleinschmidt* and *Gibson* (and later *Tappendorf, Kahler,* and *Sturdevant,* Reply at 12-14),[13] which relied on the rationale from several cases from the late 1990s, showing other special masters have determined the IRS business rate is appropriate to use in vaccine cases when calculating travel expenses. *See* Mot. at 19 (citing *Kleinschmidt v. Sec'y of Health & Hum. Servs.,* No. 20-680V, 2023 WL 9119039 (Fed. Cl. Spec. Mstr. Dec. 5, 2023); *Gibson v. Sec'y of Health & Hum. Servs.,* No. 20-243V, 2022 WL 17820891, at *12 (Fed. Cl. Spec. Mstr. Oct. 5, 2022)); *see also Williams v. Sec'y of Health & Hum. Servs.,* No. 99-2239V, 1996 WL 608455 (Fed. Cl. Spec. Mstr. Oct. 10, 1996); *Ashe-Robinson v. Sec'y of Health & Hum. Servs.,* No. 94-1096V, 1997 WL 54350 (Fed. Cl. Spec. Mstr. Jan. 23, 1997)).

As the *Williams* special master explained, the greater business mileage rate "is intended to cover *all* costs of driving a car," not only the cost of gasoline and oil. *See* 1996 WL 608455, at *2. Thus, it includes the fixed costs of driving a car, including depreciation, maintenance, insurance, and repairs. *Id.*; *see also Ashe-Robinson,* 1997 WL 54350, at *2-3 (reimbursing the petitioner for the full cost of operating her personal vehicle using

---

[11] The IRS business mileage rate Petitioner argues should apply is $0.56 and $0.655.

[12] The IRS medical mileage rate Respondent argues should apply is $0.16 and $0.22.

[13] *Tappendorf v. Sec'y of Health & Hum. Servs.,* No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb. 23, 2024); *Kahler v. Sec'y of Health & Hum. Servs.,* No. 19-1938V, 2024 WL 1928451 (Fed. Cl. Spec. Mstr. Mar. 27, 2024); *Sturdevant v. Sec'y of Health & Hum. Servs.,* No. 17-172V, 2024 WL 1045145 (Fed. Cl. Spec. Mstr. Feb. 12, 2024).

the greater IRS business rate but only actual costs for meals and gasoline when transported in another individual's car).

Respondent has not offered persuasive authority or legal citation supporting application of the lower IRS medical mileage rate in the Program context. Respondent also has not shown that any other federal compensatory statutory frameworks apply the lower medical rate and/or follow the Code's differentiation of rates.

Petitioner's application of the case law is on point here. I have recently addressed this distinction, observing that "damages paid to claimants who have met the legal standard of proving a vaccine injury arise under the specific terms of the Vaccine Act – not the Tax Code. And the Vaccine Act mandates that a petitioner be awarded their "actual" unreimbursable expenses." *Tappendorf v. Sec'y of Health & Hum. Servs.,* No. 20-1592V, 2024 WL 1299566 (Fed. Cl. Spec. Mstr. Feb. 23, 2024) (citing Section 15 (a)(1)(B)). Further, applying the logic in *Williams*, "each mile driven in a vehicle increases wear and tear, thereby increasing fixed costs (i.e., depreciation, repairs, etc.)." *Id.* Thus, an award of the operating costs of the vehicle alone "would not represent a petitioner's "actual" expenses incurred." *See id.* And while the Tax Code may reasonably distinguish between levels of deduction for vehicle usage, based upon whether the car was used for a business purpose or not, that same distinction "may not be proper in the context of a Vaccine Act award." *See Walter v. Sec'y of Health & Hum. Servs.,* No. 21-1461V, 2024 WL 1299576 (Fed. Cl. Spec. Mstr. Feb. 27, 2024) (finding that "[t]his seems, to some extent, to have been the thinking of the *Williams* special master[, and that a]pplication of the higher rate is ultimately consistent with the Act's language.").

Accordingly, and consistent with my own prior decisions, Petitioner's travel expenses should be reimbursed using the IRS business mileage rate employed in *Williams*, as consistently applied in the Vaccine Program. *See*, e.g., *Kleinschmidt*, 2023 WL 9119039, at *7; *Gibson,* 2022 WL 17820891, at *12; *Tappendorf,* 2024 WL 1299566, at *4-5.

However, as discussed in detail above, and because I have determined Petitioner's treatment in 2023 was too attenuated to be vaccine-caused, I will not award Petitioner's requested sum for mileage incurred during that timeframe, totaling $75.194 (rounded to the nearest cent, $75.19). I will therefore award Petitioner the remaining amount of mileage expenses he seeks, $193.88, based upon a business mileage rate, as proposed. **I thus award actual past unreimbursed expenses in the amount of $1,581.88.**

Conclusion

In view of the evidence of record, I find that there is preponderant evidence that the onset of Petitioner's injury was within 48 hours of his vaccine, he experienced limited ROM, and he has otherwise satisfied the requirements for a Table SIRVA claim. Further, based on the evidence of record, I find that Petitioner is entitled to compensation.

I also find that, for all of the reasons discussed above and based on consideration of the record as a whole, **$111,581.88 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering and past unreimbursed expenses,**[14] **and shall be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner**. This amount represents compensation for all items of damages that would be available under Section 15(a). *Id*.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this Decision.[15]

**IT IS SO ORDERED.**

> **s/Brian H. Corcoran**
> Brian H. Corcoran
> Chief Special Master

---

[14] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* § 15(f)(4)(A); *Childers v. Sec'y of Health & Hum. Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Hum. Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[15] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.